# United States Court of Appeals
## *for the*
## Federal Circuit

KOSHY MATHAI, M.D.,

*Plaintiff-Appellant,*

- v. -

UNITED STATES,

*Defendant-Appellee,*

ON APPEAL FROM THE UNITED STATES COURT OF FEDERAL

CLAIMS IN CASE No. 1:24-cv-01954-SSS, Judge Stephen S. Schwartz

## CORRECTED REPLY BRIEF FOR PLAINTIFF-APPELLANT

Koshy Mathai, M.D.
*Pro se Appellant*

**January 26, 2026**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES

INTRODUCTION

SUMMARY OF ARGUMENT

ARGUMENT

I. Standard of Review

A. DOJ Cannot Win Dismissal by Factual Reframing or "Conclusory" Relabeling

II. The Trial Court Erred in Finding No Cognizable Property Interest

A. Title 38 is a Market-Driven Acquisition Framework for Specialized Medical Labor

B. The Property Interest is the Appellant's Specialized Labor Itself, Not "Continued Employment"

C. "Managerial Discretion" Rhetoric Fails Because VA's National Privileging Architecture, and VA Bylaws Implementing It, Defines the Lawful Scope of Clinical Work

III. The Amended Complaint Plausibly States a Claim for a Taking

A. The "Free to Leave" Premise Fails

B. The Diversion was Premeditated, Not a Routine Management Change

C. Economic Impact is the Market Value of Diverted Specialty Labor, Not "Salary Continued"

D. Per Se and Penn Central are Not Resolvable on a Rule 12 Record

IV. The Trial Court Abused Its Discretion Regarding Procedural Orders *(rebut Govt III)*

A. New Matters in DOJ's Reply Permit a Sur-Reply

B. "§ 1500 Creep" / Collateral-Forum Reframing / MSPB-EEO "Context" were Improper and Prejudicial

C. No Affirmance on New Theories or Replacement Merits Analysis

CONCLUSION

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

Cases

*Adams v. United States*,

391 F.3d 1212 (Fed. Cir. 2004) …………………………..…1-2,4,18,29,30,31

*Air Pegasus of D.C., Inc. v. United States*,

424 F.3d 1206 (Fed. Cir. 2005) …………………………………...……18

*Alimanestianu v. United States*,

888 F.3d 1374 (Fed. Cir. 2018) …………………………………………...20

*Am. Farm Lines v. Black Ball Freight Serv.*,

397 U.S. 532 (1970) …………………………………………………...27

*Appolo Fuels, Inc. v. United States*,

381 F.3d 1338 (Fed. Cir. 2004) …………………………………………...26

*Cafeteria & Restaurant Workers Union, Local 473 v. McElroy*,

367 U.S. 886 (1961) …………………………………………………...12

*Commonwealth Edison Co. v. United States*,

271 F.3d 1327 (Fed. Cir. 2001) (en banc) …………………………..………26

*Corn v. City of Lauderdale Lakes*,

95 F.3d 1066 (11th Cir. 1996) …………………………………………18

*Cushman v. Shinseki*,

576 F.3d 1290 (Fed. Cir. 2009) …………………………………………...17

*Engquist v. Or. Dep't of Agric.*,

553 U.S. 591 (2008) …………………………………………………....12

*Hardison v. Cohen*,

375 F.3d 1262 (11th Cir. 2004) …………………………………………...25

*Info. Sys. & Networks Corp. v. United States*,

994 F.2d 792 (Fed. Cir. 1993) …………………………………………………27

*Mitchell Arms, Inc. v. United States*,

7 F.3d 212 (Fed. Cir. 1993) …………………………………………………9-10

*Morton v. Ruiz*,

415 U.S. 199 (1974) ……………………………………………………...17

*Penn Central Transp. Co. v. City of New York*,

438 U.S. 104 (1978) ……………………………………...…4,5,18,24,26,31

*Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*,

507 U.S. 380 (1993) ……………………………………………………...27

*Sekhar v. United States*, (No. 12-357), Brief for the United States

570 U.S. 729 (2013) …………………………………...……………………… 21

*United States ex rel. Accardi v. Shaughnessy*,

347 U.S. 260 (1954) …………………………………………………...…17

*Vitarelli v. Seaton*,

359 U.S. 535 (1959) …………………………………………………....17

*Waters v. Churchill*,

511 U.S. 661 (1994) …………………………………………………12

*Weber v. Dep't of Veterans Affairs*,

521 F.3d 1061 (9th Cir. 2008) ………………………………………….25

Rules

RCFC 12(b)(6)

Fed. Cir. R. 31(a)(3)

Fed. Cir. R. 32(a)(7)

Fed. Cir. R. 32(b)(1)

Fed. Cir. R. 32(b)(2)

Fed. R. App. P. 28(c)

Fed. R. App. P. 32(a)(7)

Fed. R. App. P. 32(g)(1)

Statutes

U.S. Const. amend. V

28 U.S.C. § 1500

38 U.S.C. § 7431(a)

Other Authorities

VA Handbook 5007, Pay Administration

VHA Handbook 1100.19, Credentialing and Privileging (Oct. 2, 2007)

VHA Directive 0999(1), VHA Policy Management (Mar. 29, 2022)

VHA Directive 1100.21(1), Privileging (Mar. 2, 2023)

VHA Directive 1100.20(2), Credentialing of Health Care Providers (Sep. 11, 2024)

Medical Staff Bylaws 2017, Amended (July 2019)

CTVHCS Bylaws & Rules of the Medical Staff (2023)

CTVHCS Bylaws & Rules of the Medical Staff (2025)

## INTRODUCTION

This appeal arises from the Court of Federal Claims' Rule 12(b)(6) dismissal of Appellant's Fifth Amendment takings claim. Appellant does not challenge ordinary personnel decisions, benefits determinations, or workplace reassignment; he challenges the Government's pre-planned acquisition and diversion of specialized labor in the setting of a coercive financial lock-in, effected by sovereign debt enforcement mechanisms, and repurposing for uses identified by the Defendant Agency pre-hire outside the bargained-for clinical appointment.

The Government's response seeks to reframe the claim as a mere dispute over internal management discretion and retention incentives. That is a category error: Appellant alleges appropriation of a specific, acquired-use labor interest secured through statutory market-based acquisition mechanisms and enforced through a federal debt instrument.

This Reply is filed under Fed. R. App. P. 28(c) and Fed. Cir. R. 31(a)(3) and responds to the Government's Response Brief, addressing only those points necessary to resolve the Rule 12(b)(6) dismissal.

Appellant proceeds pro se; the Court construes pro se filings liberally, looking to substance over labels.

# SUMMARY OF ARGUMENT

This is an appeal from a Rule 12(b)(6) dismissal. The question is whether the Amended Complaint plausibly states a Takings Clause claim under the pleading standard --- not whether the Government's extra-record narrative should prevail on the merits. At this stage, the Court must accept well-pleaded factual allegations as true and draw reasonable inferences in Appellant's favor; the Government cannot defeat plausibility by relabeling pleaded facts as "conclusory," disputing motive and sequence, or importing collateral "context" to litigate facts outside the complaint all while denying factual development.

The trial court ended the case at step one by misdefining the alleged "property" as mere expectations about the terms or compensation of federal employment and then holding, under *Adams*, that such expectations are "not property." Appx002–003. That framing is a category error. The property taken is not the continued federal employment or any discretionary benefit according to the Appellant's Pleading. He pleads a property interest in his own specialized medical labor taken and planned for diversion from the represented clinical purpose to a different pre-identified use.

The "background law" here is not free-floating managerial discretion: VA's national privileging architecture and implementing bylaws define the lawful scope

2

of clinical work that may be required and therefore define the boundaries of the acquired-use the Government obtained. DOJ also asserts that "[t]he rights, if any," associated with realignment "arise from statute or regulation and could be redressed, if at all, through those mechanisms." Gov't Br. at 11. That objection misses what Appellant is doing at step one. Appellant replies: Title 38, VA handbooks, and VA's privileging bylaws not as freestanding causes of action to be "redressed" elsewhere, but as the Government's own appointment-tethered rules that define what clinical work may lawfully be required and therefore define the boundaries of the acquired use the Government obtained. Indeed, DOJ simultaneously relies on a VA Handbook as "mandatory guidance and procedures for pay administration" for Title 38 physicians while appearing to insist that "VA Handbook / background law" supplies nothing relevant to whether a cognizable interest exists. Gov't Br. at 3–4; Gov't Br. at 11. The Government's "managerial discretion" and "proprietor" rhetoric cannot redefine the relevant interest at step one or convert Rule 12 review into a constitutional safe harbor.

The Government's assertion that Appellant "identifies nothing in Title 38, the VA Handbook, or any other background law" is contradicted by the Government's own Statement of Facts: DOJ itself invokes Title 38's specialty/assignment market-pay framework and acknowledges that VA made Appellant's initial pay determination "as part of the hiring and recruitment

process," tied to "recruitment and retention needs for the specialty or assignment," and that VA Handbook 5007 supplies "mandatory guidance and procedures for pay administration" for Title 38 physicians. Gov't Br. at 3–4, 11; Appx039–042.

DOJ's "Separately" phrasing is a sleight of hand. DOJ concedes the market-pay panel and the initial pay determination were "part of the hiring and recruitment process," producing the approved $320,000 annual rate of pay, and then says "Separately, Dr. Mathai signed a 'recruitment service agreement'." Appx039–042; Gov't Br. at 3. First, exit was foreclosed by a debt-backed service obligation tied to the appointment: the Recruitment Service Agreement conditioned the $50,003 incentive on 52 pay periods of service and made noncompletion a federal "debt due the United States." Appx047–048. A debt-backed service obligation that is expressly tethered to the appointment is part of the same acquisition architecture, not a "separate" side arrangement. Second, the pleaded sequence plausibly supports a premeditated acquired-use diversion, not a routine management change.

DOJ's step-two merits push underscores the error. The Court of Federal Claims never reached DOJ's per se or *Penn Central* theories; it dismissed at step one after redefining the interest and applying *Adams*. Appx002–003. DOJ now asks this Court to affirm on a first-instance, fact-intensive *Penn Central* analysis the lower court never performed, asserting "as a matter of law" that no economic impact occurred. Yet DOJ itself recognizes that takings determinations are legal

conclusions grounded in "factual underpinnings," and *Penn Central* is fact-bound. Gov't Br. at 14–15. The remedy for a corrected step-one error is vacatur and remand, not affirmance on the Government-offered merits analysis supplied on appeal.

Separately, the trial court abused its discretion by denying Appellant a fair opportunity to respond to new matter and collateral-forum reframing introduced in the Government's reply. The record shows why: Appellant sought leave to file a Sur-reply specifically because the Government's Reply at the Court raised new matter, including a new §1500 invocation. That procedural asymmetry is now repeated on appeal, where DOJ again injects collateral MSPB/EEO "context" and other extra-record allusions to recast this constitutional claim as an employment dispute, simultaneously insisting such "context" was not considered at the lower court. But there is nothing in the lower court's Opinion and Order to suggest that the *Government's* Reply was not considered; the Opinion and Order indicated only that the *Appellant's Sur-reply* was not considered by the Court, and thus may remain sealed. That asymmetry denied Appellant a fair opportunity to respond, prejudices meaningful review and compounds the dismissal error.

On remand, the Court would reassess step one under the correct property definition and only then address any step-two per se or Penn Central issues, if reached, on an appropriate factual record.

# ARGUMENT

## I. Standard of Review

Dismissal under Rule 12(b)(6) is reviewed de novo. The Court must accept all well-pleaded factual allegations as true and draw all reasonable inferences in favor of the nonmovant. A complaint need only state a plausible claim for relief.

### A. DOJ Cannot Win Dismissal by Factual Reframing or "Conclusory" Relabeling

The Government writes as if this were summary judgment, but this is an appeal from a Rule 12(b)(6) dismissal. The Response Brief repeatedly challenges well-pleaded factual allegations, either directly, or by relabeling them as "conclusory", to defeat plausibility by argument. That is backwards. The Government's "conclusory" refrain follows a recurring maneuver: it omits the pleaded mechanism, re-describes the claim at a higher level of abstraction, then declares the claim "conclusory."

Appellant's claim rests on pleaded facts: a premeditated diversion plan with use of lawful authority to appoint; supported by record evidence of a defined service obligation backed by a debt instrument; the appropriation of acquired-use labor under coercive lock-in. The Government invokes the idea that a federal employee's expectations depend on "the legal structure governing the

appointment", but they then treat that "legal structure" as if it were nothing more than generic managerial discretion. Appx003. Here, the Rule 12 record shows the opposite: the appointment-linked structure included (i) a recruitment incentive conditioned on a fixed two-year service obligation in Surgical Service at CTVHCS, enforceable as a federal "debt due the United States", and (ii) VA's own recognition that the realignment implicated OPPE/privileges boundaries. At Rule 12(b)(6), the pleaded mechanism and reasonable inferences control. Appx 047-048.

Whether the Government ultimately disputes these facts is irrelevant at this stage; if the Government's response depends on factual disputes ("routine," "voluntary," "at will"), the dismissal must be reversed. To be clear, Appellant was not privileged in Addictionology / evaluation and treatment of Addiction.

## II. The Trial Court Erred in Finding No Cognizable Property Interest

### A. Title 38 is a Market-Driven Acquisition Framework for Specialized Medical Labor

The Government's response treats Title 38 employment as indistinguishable from generic federal "public employment." That framing ignores Congress's intent: Title 38 is designed as a market-driven acquisition system for specialized medical labor, allowing the Government to compete for physicians through specified financial benefits; but in order to do so, the Government makes a determination

that the appointment is for the healthcare services as determined to be necessary for the treatment of Veterans --- identifying the needed labor in order to appoint.

**B. The Property Interest is the Appellant's Specialized Labor Itself, Not "Continued Employment"**

The Government argues Appellant has no property interest because federal employment expectations are not property. **The Government's focus is reversed: their argument misstates the claim**. Appellant does not claim a property interest in continued employment or a job title; he claims a property interest in acquired-use specialized labor appropriated via that employment and job title --- not the benefits of the appointment but the function and reason of the appointment itself.

The Government's retort, "Dr. Mathai identifies nothing in Title 38, the VA Handbook, or any other background law that suggests that such a property right exists", only works by swapping Appellant's claim into a different one. Gov't Br. at 11. **Appellant did not plead a property right in "employment with VA."** Appellant pleaded an acquired-use appropriation of specialized labor under concrete, appointment-tethered instruments and agency-administered constraints. identified in the Rule 12 record. Whether DOJ disputes the inferences the record supports is merits litigation; at Rule 12, DOJ cannot erase plausibility by relabeling

the pleaded acquired-use appropriation theory as a mere federal-employment expectation.

Takings doctrine recognizes property interests beyond real estate and recognizes appropriations where the Government compels use of an interest for a different public purpose. As explained in § II.C, VA's national privileging architecture and bylaws-based gatekeeping are the relevant background law for "reasonable expectations" in this clinical context. Appellant plausibly pleaded that the Government acquired specialized labor under a market-based framework; it held it in place with debt enforcement power and acted to divert it to a different clinical use.

The Government argues that the "right to exclude" is a concept confined to real property and is irrelevant here. Gov't Br. at 15–17. That is incorrect. Supreme Court precedent treats the right to exclude as a hallmark of property interests generally, not solely land. Appellant's claim is that the Government took control over the use of his specialized labor (the "use right"), not merely that it changed job duties. The Government's attempt to cabin the right-to-exclude doctrine to land is unsupported and is, again, a category error.

DOJ's next step is to argue that Appellant cannot "exclude . . . the Government" from Title 38 labor, citing *Mitchell Arms.* Gov't Br. at 18. That

analogy fails. *Mitchell Arms* held that a firearms importer lacked a cognizable property interest where it had no right to exclude the Government from a business already subject to pervasive governmental oversight and control. *Mitchell Arms v. United States*, 7 F.3d 212, 215 (Fed. Cir. 1993). Appellant does not claim a right to "exclude" the VA from managing its workforce or overseeing clinical operations. Appellant claims that the VA's own nationally imposed privileging structure defines the lawful boundary of compelled direct patient care, i.e., the agency itself conditions independent clinical practice on individually granted privileges and treats practice outside that scope as unlawful.

Put differently, the "exclude" concept in Appellant's theory is not an attempt to bar the Government from its own operations; it is the agency-imposed boundary that bars compelled patient care outside granted privileges. DOJ's "you can't exclude your employer" retort therefore attacks a strawman: Appellant's claim is that the Government cannot convert a privilege-bounded clinical-use interest into an unbounded one by relabeling compelled clinical work as "reassignment."

The Government asserts there is "no precedent" for a per se taking outside classic physical occupations. Gov't Br. at 15. Novelty is not a Rule 12(b)(6) defense. The absence of a case "on all fours" does not authorize categorical dismissal; it simply means the Court applies settled takings principles to the pleaded property definition and the pleaded mechanism of appropriation, rather

than dismissing at the threshold by insisting that only the familiar fact patterns are cognizable. Nonetheless, Per se takings doctrine extends to compelled appropriations of property interests where the Sovereign commandeers a use right.

**C. "Managerial Discretion" Rhetoric Fails Because VA's National Privileging Architecture, and VA Bylaws Implementing It, Defines the Lawful Scope of Clinical Work**

The Government stated in its Response Brief: "Dr. Mathai identifies nothing in Title 38, the VA Handbook, or any other background law that suggests that such a property right exists. Simply put, the bundle of interests in Dr. Mathai's professional labor did not include the stick of the right to exclude his employer, the VA, from making organizational changes to the Medical Center, including the realignment of the Pain Section from Surgery Service to Whole Health Service, or the transfer of Dr. Mathai's position to the Whole Health Service.

Appellant rebuts, raising for judicial notice of the VA's own mandatory national Directives, Handbooks, and Facility Bylaws. These official records demonstrate that Title 38 clinical labor is not a matter of unconstrained "sovereign discretion" or "routine" HR management; rather, physician labor is a specialized property interest governed by a rigid privileging architecture that defines the

"lawful scope" of clinical work and even distinguishes Medical Staff appointments from ordinary HR employment.

DOJ's "government-as-proprietor" cases do not decide the pleaded claim. DOJ invokes *Waters* and the *Engquist/Cafeteria* line to argue that recruitment, reorganization, and assignment decisions are merely internal employer management, and warns that recognizing a taking here would "fundamentally transform the basic relationship between the United States and its employees." Gov't Br. at 13, 16 (citing *Waters v. Churchill*, 511 U.S. 661, 674–75 (1994); *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 598 (2008) (quoting *Cafeteria & Rest. Workers v. McElroy*, 367 U.S. 886, 896 (1961)). Appellant's claim is narrower and different: it is not "any reassignment = taking." In reality, the Realignment under the Whole Health Service was not the Defendant Agency's first foray into taking of the Appellant's labor as attempts were made even prior to that realignment being enacted.

The Government used sovereign instruments --- appointment authority plus a debt-backed service obligation --- to acquire and lock in a defined labor-use interest, and then attempted to compel direct patient care outside the agency's own mandatory privileging gate that defines lawful clinical work. Enforcing that privilege-bounded boundary does not constitutionalize routine management. VHA National policy makes the hierarchy and function of Medical Staff Bylaws explicit.

**First**, National defines VA Medical Centers' Bylaws as rights-and-responsibilities instruments, which requires that practitioners be furnished the bylaws and bound to them: Medical Staff members "receive a copy of the Bylaws and Rules and agree to abide by the professional obligations therein". Medical Staff Bylaws 2017, Amended July 2019. Appx185-186; Appx198.

**Second**, National overrides Local: "Nothing in the VA medical center Medical Staff Bylaws, Rules, and Regulations can have any effect inconsistent with, or otherwise be inconsistent with, law, VA regulations, this Handbook's policies and procedures, or other VA policies." National policy also tightens that requirement operationally by placing responsibility on facility leadership to ensure local bylaws conform: "Local facility policy, including Medical Staff Bylaws, Rules and Regulations, is consistent with this Handbook." VHA Handbook 1100.19, Credentialing and Privileging (Oct. 2, 2007). Appx162-165. Further, "Local policy … may be established only by exception." VHA Directive 0999(1), VHA Policy Management (Mar. 29, 2022), Appx166-167.

VHA defines Medical Staff Bylaws as governance, not "local custom" or whim, and expressly states they "create a system of rights, responsibilities, and accountabilities" between (i) the organized medical staff and the facility Director as governing body, and (ii) the organized medical staff and its members. VHA Directive 1100.21(1), Privileging (Mar. 2, 2023). Appx171-172; Appx178. VHA

Directive 1100.20(2), Credentialing of Health Care Providers (Sep. 11, 2024). Appx182-184.

And where the Government's response attempts to treat "reassignment" as dispositive "background law," VHA's policy-management directive supplies the hierarchy rule: "[w]here contradiction exists between local policies and VHA national policy, the VHA national policy supersedes and controls," and "[l]ocal policy … may be established only by exception." VHA Directive 0999(1), VHA Policy Management (Mar. 29, 2022); Appx167-169. Even the Handbook the Government cites cabins local bylaws the same way: "[n]othing in the VA medical center Medical Staff Bylaws, Rules, and Regulations can have any effect inconsistent with … this Handbook's policies and procedures, or other VA policies." VHA Handbook 1100.19, Credentialing and Privileging (Oct. 2, 2007). Appx164.

And VHA's privileging directive ties independent practice to *facility bylaws* and *individually granted privileges*: LIPs are permitted to practice independently "by the VA medical facility through the Medical Staff Bylaws … and in accordance with individually granted clinical privileges." VHA Directive 1100.21(1), Privileging (Mar. 2, 2023). Appx174.

14

Against that national framework, the CTVHCS bylaws across versions confirm the same core structure: privileges are obtained and changed by practitioner request --- not managerial fiat. The 2017/2019 version states: "All practitioners request for clinical privileges or delineation of scope of practice must be made in writing …" Medical Staff Bylaws 2017, Amended July 2019. Appx197.

 The 2023 version repeats the same rule: "All practitioners request for clinical privileges or delineation of scope of practice must be made in writing …" CTVHCS Bylaws & Rules of the Medical Staff, 2023. Appx199-200; Appx202.

The 2025 version keeps the same architecture and makes the change-mechanism explicit: "A Practitioner may request modification or accretion of existing clinical privileges by submitting a formal request …" CTVHCS Bylaws & Rules of the Medical Staff, 2025. Appx204-206; Appx214.

In other words: the mechanism is written request plus documentation if/as desired **by the practitioner**; there is no mechanism authorizing leadership to unilaterally impose new privileges as though they automatically attach to "reassignment." Further, practitioner's must practice within the privileges.

The same documents tie lawful patient care to the scope of granted/delineated privileges, and treat that scope as a compliance obligation. The 2017/2019 bylaws list among "Basic Responsibilities" that members must:

"Provide care to patients within their scope of privileges …" Medical Staff Bylaws 2017, Amended July 2019. Appx193-194. The 2023 bylaws repeat the same duty: "Provide care to patients within their scope of privileges …" CTVHCS Bylaws & Rules of the Medical Staff, 2023. Appx201. The 2025 bylaws similarly require that practitioners "must agree to provide care to patients within the scope of their Delineated Clinical Privileges or Scope of Practice …" CTVHCS Bylaws & Rules of the Medical Staff, 2025. Appx210.[1]

And where the bylaws address situations that might tempt leadership to "just have the practitioner do it anyway," they tighten the opposite direction; as an example, for medical staff members who deploy: "If privileges lapse … the practitioner must apply for renewal prior to providing care to patients … [and] may not provide direct patient care." Medical Staff Bylaws 2017, Amended July 2019. Appx197. Read together (and as constrained by National policy), the bylaws' logic is consistent across versions: privileges are requested, granted, and modified through defined processes; additional privileges are only granted upon processes initiated by the practitioner himself/herself and practitioners are responsible to

---

[1] For context, VHA Directive 1100.21 requires that the VA Medical Facility Chief of Staff ensures "VA medical facility compliance with Joint Commission Medical Staff Standards". Appx179-181. Joint Commission MS.03.01.01, EP 2 is explicit: "**Practitioners practice only within the scope of their privileges** as determined through mechanisms defined by the organized medical staff." This is core accreditation / incorporated by VHA 1100.21.

practice only within the privileges actually granted, not within whatever additional duties management wishes to assign without a privileges request by the provider and subsequent approval.[2]

This regulatory boundary is not merely internal policy; it is a binding constraint under the **Accardi** doctrine. It is a 'well-settled rule that an agency's failure to follow its own regulations' or procedures constitutes a violation of law, especially where those rules protect individual interests. *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 267 (1954); *see also Morton v. Ruiz*, 415 U.S. 199, 235 (1974) (holding that where the rights of individuals are affected, agencies must follow their own procedures). The VHA Directives, Handbooks, and Bylaws, which DOJ admits provide 'mandatory guidance', define the 'existing rules or understandings' that form the basis of a property interest. *Cf. Cushman v. Shinseki*, 576 F.3d 1290, 1297-98 (Fed. Cir. 2009) (finding property interests in VA-administered benefits based on statutory entitlement). By establishing a system where clinical labor is tied strictly to 'individually granted clinical privileges', the VA 'denies itself the right' to unilaterally repurpose that labor without adhering to its own privileging gate. *Vitarelli v. Seaton*, 359 U.S. 535, 539-40 (1959).

---

[2] Central Texas VA's Bylaws from 2017-2025 consistently require that providers must practice within their granted privileges and one can only add new privileges through process initiated by ones' own request. Appx192-196; Appx203; Appx207; Appx210.

Consequently, these rules constitute the 'background law' that affirms Appellant's specialized labor into a cognizable property interest protected from uncompensated appropriation.

The Government tries to neutralize the "background law" showing by asserting that "'Property' as used in the Just Compensation Clause is defined much more narrowly than in the due process clauses," citing *Corn and Adams*. Gov't Br. at 15 (citing *Corn v. City of Lauderdale Lakes*, 95 F.3d 1066, 1075 (11th Cir. 1996); *Adams v. United States*, 391 F.3d 1212, 1220 n.4 (Fed. Cir. 2004)).) That move does not defeat Appellant's claim; it simply restates that Takings property must be defined by an independent source. *Air Pegasus*, on which DOJ itself relies, confirms that the "existing rules and understandings" that define property may be "derived from an independent source, such as state, federal, or common law." *Air Pegasus of D.C., Inc. v. United States*, 424 F.3d 1206, 1213 (Fed. Cir. 2005). Appellant's point is precisely that: the VA's nationally mandated privileging/credentialing gate (through binding directives and bylaws that protect practitioner and patient) is the independent federal-law source that defines the scope of authorized clinical work and, therefore, defines the labor-use interest the Government acquired and then attempted to commandeer beyond that boundary.

The Government argues reassignment "precludes" *Penn Central* analysis because Appellant supposedly "could be" moved at will. Gov't Br. at 20.

Appellant's pleading is on the labor, not the "move." The Government's premise also fails under VA's own privileging architecture. National privileging policy requires that patient care be provided through Medical Staff Bylaws and "in accordance with individually granted clinical privileges." VHA Directive 1100.21(1) (Mar. 2, 2023). Appx174. The local bylaws implement the gate: practitioners "must practice under their privileges or scope of practice," and privilege requests are practitioner-initiated and specific. Medical Staff Bylaws (2025); VHA Handbook 1100.19 (Oct. 2, 2007). Appx165; Appx210-215. Thus the "reassignment" the Government points to is not a neutral managerial act; it is compelled performance of non-privileged-for clinical work while Appellant was held in place by a debt instrument. That is appropriation.

The above definitively rebuts the Government's broad claim that "within the context of Federal employment, Appellant could not have had any reasonable expectations to be free from internal reassignment, agency reorganization, or even the elimination of a position", once the Government's strawman is teased apart. Gov't Br. at 16. Appellant does not claim immunity from all internal movement; he pleads that VA acquired *specialized, privileged* Pain-Management labor for a represented clinical purpose and then acted to repurpose that acquired to fulfill a premeditated plan. Even the recruitment posting language DOJ leans on is narrower than DOJ's gloss: it states only that, if patient needs arise, "the

incumbent… may be reassigned within the Central Texas Veterans Health Care System", not that leadership may compel a different type of clinical work outside of granted privileges in contradiction to Medical Center Bylaws or treat specialty privileges as irrelevant. Appx043.

By the time the Defendant Agency officials' sequence of actions reached realignment as the next step in compelling the labor, the contemporaneous realignment record confirms that privileging/OPPE boundaries were treated as a required gate: leadership directed staff to "wait until the realignment is complete before touching the OPPE's and privileges," and noted "we need to make changes for the Pain specialists." Appx055–056. That record evidence directly answers DOJ's dismissal that "certifications/privileges reflect… investment" is "undeveloped": the Appendix shows VA itself treating privileges as an operational constraint that had to be addressed to effectuate the diversion. Gov't Br. at 16.

The absurdity of the Government's legal framing is laid bare by its selective invocation of sovereign authority. The Government cites *Alimanestianu* to compare its routine administrative realignment of a clinic to the high-level 'Executive's role in conducting foreign affairs', yet simultaneously dismisses property definitions from criminal law as being of 'limited value'.[3] *Alimanestianu v. United States*, 888

---

[3] The Government offers that the authorities Appellant drew were from a brief filed by the Government in opposition to a petition for a writ of certioriari in

<u>F.3d 1374</u> (Fed. Cir. 2018). It is logically incoherent to claim the shield of a sovereign power akin to international diplomacy while ignoring that the 'administrative' chain of events included pressure being applied to Appellant's use of labor to outside his Interventional Pain specialty as per an OSC 1213 investigation report published in 2022.[4]

## III. The Amended Complaint Plausibly States a Claim for a Taking.

### A. The "Free to Leave" Premise Fails

The Government asserts that Appellant was "free to terminate" and therefore cannot plead a taking. That premise is factually and legally misleading. Appellant pleaded that he was bound by a Recruitment Service Agreement imposing a 52 pay-period service obligation, backed by a debt "due the United States" if he did not complete the obligation. That debt leverage is not a mere "workplace

---

*Sekhar v. United States*, S. Ct. No. 12-357, "case that involved the definition of "property" as an element of the Hobbs Act, a criminal statute"; yet the Government offers neither evidence nor argument in its Response Brief to demonstrate that they undertook any criminal investigation of the actions of Central Texas VA Management Officials named by Plaintiff. The Government's "criminal law" label functions as an insinuation rather than an argument: it never explains *why* the property concepts articulated in those cases cannot inform the "existing rules or understandings" inquiry at step one, and it provides no alternative account of what property is for takings purposes that would exclude Appellant's theory.

[4] See *Office of Special Counsel, Report to the President*: VA Central Texas Health Care System (Temple, TX), OSC **Case: DI-21-000033; DI-21-000470; DI-21-000503.**

inconvenience"; it is sovereign enforcement power used to hold acquired labor in place.

The complaint included evidence of a fixed service obligation backed by an enforceable federal debt. The Recruitment Service Agreement tied a $50,003 incentive to a defined service period and provided that failure to complete the obligation created a "debt due the United States." Appx048.

The Government's "free to leave" argument is a legal conclusion premised on ignoring the debt instrument as well as any costs associated with change of employment. Even should the Government "borrow" usage of property and return it, such an event still constitutes a Taking; a "freedom to leave" argument that ignores the debt is not a Rule 12 basis to dismiss.

## B. The Diversion was Premeditated, Not a Routine Management Change

DOJ's "routine management" gloss is built on a sanitized narrative: it highlights that Appellant "disagreed" with the September 2020 realignment and that Whole Health was later "disbanded" in 2022, as if later reorg labels erase the pleaded diversion mechanism. Gov't Br. at 3. They do not. Upon information and belief, VA management later admitted that Whole Health was not intended to be its own Service. And yet, the Government characterizes the diversion as routine management discretion. Appellant pleaded the opposite: that diversion was planned

before hiring, and that the United States acquired specialized labor under a lawful authority to appoint for one clinical purpose to divert it to another use.

The Government's "routine" narrative is not a Rule 12 rebuttal; it is a factual dispute. Appellant pleaded contemporaneous pre-hire indicators of planned diversion and a build-out consistent with repurposing his labor. At Rule 12(b)(6), the Court would appropriately credit Appellant's pleaded inference of premeditation supported by the Rule 12 record cited in the appendix. Appx028–030, Appx055–058.

## C. Economic Impact is the Market Value of Diverted Specialty Labor, Not "Salary Continued"

The Government attempts to reframe the case as a "retention bonus" dispute or an expectation of discretionary pay. That is not the pleaded claim. Appellant does not plead entitlement to a bonus nor seek such a bonus as remedy with the Court; instead, the United States used a recruitment incentive as a lock-in mechanism to acquire and divert labor and when its efforts were met with disagreement, it did not pursue a retention incentive, though none of the parameters for incentive had changed at the time of Market Pay Review, and the Appellant had already reported to his Supervisory chain multiple times that he was in serious consideration of leaving.

**D. Per Se and Penn Central are Not Resolvable on a Rule 12 Record**

DOJ now urges affirmance on a substitute step-two merits rationale the Claims Court never reached. This Court is not the place for DOJ to supply a Penn Central record or obtain first-instance merits findings by appellate briefing, particularly where DOJ appears to insist that the lower court "need not allow factual development." Gov't Br. at 15. If the step-one "no property" premise is corrected, the proper course is vacatur and remand for the Court of Federal Claims to apply the takings framework in the first instance, on an appropriately developed record.

The Government's *Penn Central* analysis is also defective because it omits the coercive mechanism present in the record: the debt-backed service obligation used to lock Appellant's labor in place. *Penn Central* requires a fact-intensive inquiry into economic impact, interference with distinct investment-backed expectations, and character of the government action. *Penn Central Transp. Co. v. City of New York*, 438 U.S. 104 (1978). Those factors cannot be resolved against Appellant on a motion to dismiss where Appellant plausibly pleaded lock-in, acquired-use diversion, and premeditation.

The Government argues Appellant suffered no economic impact because he continued receiving a salary. Gov't Br. at 16. That is not the *Penn Central* metric.

Appellant alleges appropriation of specialized interventional pain labor (a market-valued use right) and action to diversion to non-bargained clinical work, with collateral reputational and professional consequences. Salary continuation does not defeat economic impact where the taken interest is the use and deployment of specialized labor under a market framework.

The Government suggests that because Appellant was a federal employee, the Takings Clause cannot apply. Gov't Br. at 14–15. That is not the law. The Takings Clause applies to appropriations of cognizable property interests regardless of whether the owner is a private contractor, license holder, or employee, where the Government commandeers a use right through sovereign power. Appellant's claim turns on coercive debt lock-in and acquired-use diversion, not on generalized "employment expectations." And its reliance on *Weber* and *Hardison* is misplaced because those cases address the lack of a property interest in continued employment --- a right Appellant does not assert here. *Weber v. Dep't of Veterans Affairs*, 521 F.3d 1061 (9th Cir. 2008); *Hardison v. Cohen*, 375 F.3d 1262 (11th Cir. 2004). Instead, Appellant asserts a property interest in the specific, acquired use of his specialized Interventional Pain labor, which was induced through a market-based Title 38 framework and then held in place by a $50,003 debt-backed service obligation. That is exactly how the Amended Complaint framed it: Appellant alleged that the "property" is his "labor

(medical services)", i.e., the acquired-use diversion of specialized interventional pain labor, not a right to continued VA employment or to any discretionary payment.

Furthermore, *Appolo Fuels* and *Commonwealth Edison* do not support dismissal at this stage; those cases recognize that takings analysis is 'fact-intensive,' yet the Government seeks to use them to block the very 'factual development', such as the premeditated nature of the diversion, that those precedents require for a proper *Penn Central* inquiry. *Appolo Fuels, Inc. v. United States*, 381 F.3d 1338 (Fed. Cir. 2004); *Commonwealth Edison Co. v. United States*, 271 F.3d 1327 (Fed. Cir. 2001) (en banc).

## IV. The Court Abused Its Discretion Regarding Procedural Orders.

### A. New Matters in DOJ's Reply Permit a Sur-Reply

The Government's appellate defense relied on theories and "context" that were amplified in DOJ's response posture (including collateral-forum framing and § 1500 insinuations). Where a party introduces new, outcome-directed material in reply, denying the opposing party a fair opportunity to respond is prejudicial and an abuse of discretion—particularly where the lower court's dismissal turned on a threshold, categorical framing that DOJ then attempts to expand into alternative grounds for affirmance.

DOJ defends the out-of-rule enlargement by invoking "ends of justice," citing *Am. Farm Lines*, and by gesturing to a non-event default under RCFC 55, citing *Info. Sys.* Gov't Br. at 24. That misses the error and the prejudice. First, Appellant never sought a default judgment; DOJ's default rhetoric is a procedural strawman. Second, where a party seeks relief after a deadline, the governing framework is excusable neglect as articulated in *Pioneer*. *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 395 (1993). *Am. Farm Lines* recognizes general discretion to manage procedure, but it does not authorize dispensing with the governing standard in a way that yields one-sided prejudice. *Am. Farm Lines v. Black Ball Freight Serv.*, 397 U.S. 532, 538–39 (1970). And *Info. Sys.*' preference for merits over default does not cure prejudice where Appellant did not request default and the enlargement was used to expand collateral, extra-record "context such as MSPB/EEO matters in an attempt to convince the lower court *not* to factually develop a case that the government itself admits is 'fact-intensive' and dismiss, rather than to join the acquired-use theory pleaded. *Info. Sys. & Networks Corp. v. United States*, 994 F.2d 792, 795 (Fed. Cir. 1993). On this record, the failure to apply the *Pioneer* framework and the resulting prejudice was an abuse of discretion.

**B. Invocation of § 1500 / Collateral-Forum Reframing / MSPB-EEO "Context" were Improper and Prejudicial**

The Government's position reflects incremental drift: each filing adds a new dismissal lane, then treats that add-on as if it were preserved and dispositive. The Court should evaluate only the grounds actually adopted by the Court of Federal Claims and reject post hoc expansion, whether styled as § 1500, forum-deflection via MSPB/EEO references, or any extra-record narrative offered to reframe the pleaded claim.

The United States attempted to insert collateral-forum theories in the lower court to persuade, until only in its Reply, where it openly invoked **28 U.S.C. § 1500** in its Reply Brief --- the same Government Reply brief to which Plaintiff's Sur-Reply filed under Seal was deemed non-considered in the Court's opinion and order and is part of the instant Appeal. Now, the Government attempts to distance itself from its Reply content, seemingly in an effort to dissuade this Court from vacatur and remand:

DOJ asserts that the trial court's decision "did not even mention" the collateral "background information," and therefore did not "consider it" in the Rule 12(b)(6) analysis. Gov't Br. at 20. But the record does not support that assurance. The Opinion and Order does not identify what materials, factual context, or

framing it credited or disregarded; it does not grapple with Appellant's actual pleaded claim as pleaded; and it instead tracks the Government's reframing, treating the case as a dispute over a federal employee's expectations regarding "terms and compensation" and an incentive-type disagreement, and then dismissing on that reframed premise under *Adams*. Appx002–003. That matters because the Government itself injected the MSPB/EEO/district-court litigation context at a defined point in the Rule 12 briefing, placing it in the "Statement of the Case" portion of its motion to dismiss as purported "background" about Appellant's "prior and ongoing litigation and administrative proceedings". Appx076–077. In that posture, DOJ cannot transform the Order's silence into affirmative proof that the court did not absorb or rely on the collateral-forum context and characterization DOJ supplied, especially where the Order's reasoning mirrors the Government's incentive/employment-expectations framing while not engaging the pleaded acquired-use appropriation theory.

That noted, those collateral matters are not, and should not become, an alternative basis to affirm. The judgment from the lower court rests on the step-one "no property" ruling; DOJ's attempt to supply a step-two merits analysis for the first time on appeal underscores why the proper course, if step one is corrected, is vacatur and remand rather than affirmance via a replacement rationale.

## C. No Affirmance on New Theories or Replacement Merits Analysis

The Government argues Appellant suffered no prejudice and that extra-record matters are irrelevant. Gov't Br. at 22. But Appellant's claim is plausibility-based: he alleges an acquired-use diversion and coercive lock-in. The record citations support plausible inference of premeditation and coercion. At Rule 12, the Government cannot negate plausibility by insisting the evidence is "extra-record" while simultaneously relying on its own factual narrative.

## CONCLUSION

Accordingly, this Court should decide the appeal in its proper Rule 12(b)(6) posture --- accepting the pleaded mechanism and drawing reasonable inferences in Appellant's favor --- rather than allowing the Government to re-label a Takings Clause claim as a routine "employment reassignment" dispute. The Court of Federal Claims dismissed at the threshold under *Adams* by treating federal employment expectations as categorically non-property, but the Government has never grappled with the point Appellant has pressed from the outset: Congress created Title 38 precisely because VA physician labor is not interchangeable with ordinary CSRA/Title 5 employment, and Title 38 authorizes obtaining specialty labor. Appx002–003; 38 U.S.C. § 7431(a), (c)(2); Gov't Br. at 2–4, 10. Having invoked *Adams* as if it were universally dispositive, the Government asks this

Court to affirm on a step-two per se/*Penn Central* merits gloss the trial court never reached, even ignoring the debt-backed service obligation in the record that undermines its "free to leave" premise. Gov't Br. at 13–17; Appx048. Because this action arises under the Constitution's Takings Clause, not under *Adams* or employment-law platitudes, the appropriate disposition is vacatur and remand so the Claims Court can apply the takings framework in the first instance to the pleaded acquisition-and-diversion mechanism reflected in the Rule 12 record.

For the foregoing reasons, the judgment should be reversed and the case remanded for further proceedings consistent with the Takings Clause and the pleading-stage standard.

Respectfully submitted,

*/s/ Koshy Mathai, MD*

KOSHY MATHAI, MD

*Pro Se Appellant*

*16325 Donoher Drive*

*Austin, TX 78717*

*(504) 231-2833*

January 26, 2026      *koshymmathai@gmail.com*

# CERTIFICATE OF SERVICE

I hereby certify that on January 26, 2026, I electronically filed the foregoing CORRECTED REPLY brief with the Clerk of the Court for the United States Court of Appeals for the Federal Circuit by using the appellate CM/ECF system. Service will be accomplished by the appellate CM/ECF system.

*/s/ Koshy Mathai, MD*

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit of <u>Federal Rule of Appellate Procedure 32(a)(7)(B)</u> because it contains 6,500 words. This brief also complies with the typeface and type-style requirements of <u>Federal Rule of Appellate Procedure 32(a)(5)</u>-(6) because it was prepared in Times New Roman 14-point font, a proportionally spaced typeface.

<u>*/s/ Koshy Mathai, MD*</u>

Koshy Mathai, MD